IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ROGER HAIRSTON, | ) | No. C 06-1517 JSW (PR) |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS AND INSTRUCTIONS TO THE CLERK** |
| A. P. KANE, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

## INTRODUCTION

Petitioner, a prisoner of the State of California currently incarcerated at the Correctional Training Facility in Soledad, California[1], has filed a habeas corpus petition pursuant to 28 U.S.C. § 2254 challenging the Board of Prison Terms ("BPT") denial of parole during parole suitability proceedings in 2004. This Court ordered Respondent to show cause why a writ should not issue. Respondent filed an answer, memorandum and exhibits in support thereof. Petitioner has filed a traverse. For the reasons stated below, the petition is denied on the merits.

## BACKGROUND

In 1986, in Los Angeles County Superior Court, Petitioner was convicted of second degree murder and personal use of a firearm. The trial court sentenced him to a

---

[1]A.P. Kane was previously joined by the Court as a Respondent in this action (docket no. 3). The Clerk is directed to add A.P. Kane as a Respondent in this matter.

term of 17 years-to-life in state prison.  Petitioner's minimum parole eligibility date on the life crime was September 24, 1996.  In this habeas action, Petitioner does not challenge his conviction or sentence, but instead alleges that his due process rights were violated by the denial of parole by the BPT during his seventh parole suitability hearing on October 18, 2004.

The BPT relied, in part, upon the following account of Petitioner's commitment offense from the Board report:

> On December 29, 1985 at approximately 9:40 p.m., victim Christina Bilhimer, sustained gunshot wounds to her head and right forearm.  An alleged dispute between her and the prisoner in a parking – in a parked vehicle at a Taco Bell restaurant on Crenshaw Boulevard in Los Angeles. It was reported that the victim was in a vehicle with two male companions. Darrell Walker, owner of the vehicle, had stopped at the restaurant to get some food.  The prisoner approached the vehicle and ordered both male occupants to exit the vehicle.  The victim and the prisoner was [sic] observed struggling in the back seat of the vehicle that was – that had been parked in adjacent parking lot.  The victim died at the scene.  The prisoner was identified through a photographic lineup and was arrested on 8/2/1986.

(Respondent's Exhibit D (hereinafter "Ex. D ") at 10-11.)

Petitioner testified that he made a "bad decision" to commit this crime and that "I can't explain it. . . .it was not my intention to commit the crime when I went to –onto the scene."  (*Id.* at 11.)  Petitioner testified that he didn't remember the incident exactly, that he hadn't carried a weapon with him when he went down to the location, but that he did have weapons of his own.  (*Id.* at 11-12.)  Petitioner testified at the hearing about how he came to be carrying the weapon

> He [the man that drove me down there] insisted that – although I made the decision to accept it, but if –when he first offered I told him I had no need for it, and he says –he says you better, you need to equalize things, there's two guys sitting in the car.  So more or less to pacify him I accepted his weapon.  At that time I had no intention whatsoever to use it.

He also testified about his version of the crime

> I approached the car and told the guys that I wanted to talk to the lady in the back and they –I didn't order them out, they panicked when they saw the gun and ran off.

...

I had [the gun] in my hand, but not pointed at anyone.

...

When they left, exited the car, I got in the front seat and leaned over and asked the lady in the back where was my car.  And she says, I can't tell you.  And I insisted that she tell me.  And I went around and got in the back seat with her to try and pull her out.  I was going to take her and put her in the car with us and go and find my car. . . .But in the struggle, after about 10 or 15 minutes of struggling and harassing, you know, I'm trying to convince her that she should go.  All of a sudden I heard this explosion.  The gun's gone off and I looked at her, checked if she was still breathing, and I walked away.

(*Id.* at 13.)

Petitioner maintained that he "wasn't conscious of pulling the trigger," but realized that "I had to have pulled the trigger for it to discharge." (*Id.* at 15.)  Petitioner testified that he committed the murder when he was 55 years of age.  (*Id.* )  When asked what would preclude him from doing something like this again, he answered "There's no way, Sir.  As a matter of fact, I refuse to even have a weapon in my possession.  It's nothing but trouble."  (*Id.* at 16.)

At the hearing, Petitioner spoke about his criminal history, which includes arrests for assault in New York and Arizona in 1955 and 1956 respectively and for assault with a deadly weapon in California in 1983.  (*Id.* at 17.)  Petitioner's record included a 1960 conviction for burglary in California , for which he received a year of probation, a 1968 conviction for carrying a concealed weapon and a 1978 conviction for receiving stolen property.  (*Id.*)  Petitioner was asked about the number of arrests on his record for weapons possession and assault and how he came to be in a position to be repeatedly charged with assault.   (*Id.* at 17-20.)  He responded, "I have no control of those kinds of positions."  Petitioner also maintained, "I can only say apparently I was at the wrong place at the wrong time."  (*Id.* at 22.)  When asked if he was "sort of a bad guy," Petitioner responded, "Anything but.  I've never been aggressive."  (*Id.*)

3

1    The Panel Commissioner questioned Petitioner about his social history.  (*Id.* at

2    23-24.)  Petitioner was raised by his mother and grandmother in a family of seven

3    children.  (*Id.*)  Petitioner dropped out of high school in ninth grade.  (*Id.* at 25.)

4    Petitioner served in the U.S. Army and was honorably discharged from service.  (*Id.* at

5    26.)  Petitioner has been married twice and has six children, with whom he is in contact.

6    (*Id.* at 27.)   Petitioner described his employment history, which included working in a

7    warehouse and in upholstery and, prior to his incarceration, operating an automobile

8    dismantling business.  (*Id.* at 27-28.)

9        The BPT discussed Petitioner's "post-conviction factors," which commenced with

10   a review of Petitioner's central file and Board and psychiatric reports.  (*Id.* at 28.)   At

11   the time of the hearing, Petitioner was enrolled in Coastline University and had a

12   vocational history that included completion of auto mechanics in 1988, vocational repair

13   refurbishing in 2000 and vocational household repair in 1996.  (*Id.* at 29.)  Petitioner

14   began participating in AA in 1993 and then had a period of non-attendance,

15   recommencing in 1999 through the hearing date.  (*Id.* at 29-30.)  Petitioner received a

16   "laudatory chrono" for having a "can-do attitude" at work and for helping to produce

17   over nine hundred completed computer systems.  (*Id.* at 30.)  Petitioner had a disciplinary

18   "115" for inappropriate conduct in 1989 and five "128As" from 1986-1993, but no

19   disciplinary contacts since then.  (*Id.* at 30-31.)  Petitioner's psychiatric evaluation from

20   January 3, 2003 was quite positive, noting no evidence of any psychotic mood or thought

21   disorder.  (*Id.* at 31.)   Petitioner is described in the evaluation as possessing sincere

22   remorse and as posing a below average violence potential in the community.  (*Id.*)  The

23   report notes that the most significant factors which could be a precursor to violence is

24   drug and alcohol use which appears very unlikely because he "has not used illegal

25   substances for many years[.]"  (*Id.* at 32.)

26       The Board questioned Petitioner about his parole plans, which included plans to

27

28                                                    4

reside with his wife in Los Angeles, California.  (*Id.*)  Petitioner stated that he had plans to work at his own computer repair shop, if his health permits, but that he had recently been diagnosed with prostate cancer and intended to support himself with SSI and income on properties he owns with his wife.  (*Id.* at 32.)  Petitioner provided a significant number of letters of support from family, members of the community and friends, including his children, ex-wife, and his current wife, with whom he intends to live and who intends to provide emotional and financial support.  (*Id.* at 36-43.)

The Deputy District Attorney from Los Angeles County questioned Petitioner about whether the shooting was about drugs that were stolen.  The Deputy also asked him whether he had cocaine in his possession when was arrested. (*Id.* at 47-48.) Petitioner answered, "That's what I was told, but I haven't seen it.  I never seen any evidence of that because I did not have any cocaine, as far as I know of."   (*Id.* at 48.) The District Attorney argued that Petitioner should not be released because he poses an unreasonable risk of danger to the community, noting that the arresting detective provided information that Petitioner sought return of stolen drugs rather than his personal property.  *See*, Respondent's Exhibit B (Los Angeles County Probation Report).  The Deputy argued that the factors supporting a denial include the circumstances of the crime, Petitioner's lengthy arrest record which attests that his dangerous has not decreased with age given that the murder occurred at age 55 and that Petitioner's words of remorse are empty.  (Ex. D at 50-52.)   In his own closing remarks, Petitioner expressed his remorse and his determination "to be an asset to the community and a law-abiding citizen." (*Id.* at 35.)

After a recess to consider the evidence before it, the BPT found that Petitioner was suitable for parole and would not pose an unreasonable risk of danger to society and a threat to public safety if released from prison.  (*Id.* at 58.)  The presiding Commissioner explained that while in prison, Petitioner had upgraded vocationally and educationally,

that his recidivism risk is reduced because of his age, and that he had realistic parole plans for his release, significant family support, improvements in behavior in prison which reflects improved self-control, remorse and positive psychological evaluations. (*Id.* at 58-61.)  The Board calculated Petitioner's term under the matrix to set a term.  (*Id.* at 64.)  The BPT set a condition of parole that Petitioner submit to drug and alcohol testing.  (*Id.* at 66.)

The Governor of California reversed the BPT's decision finding Petitioner suitable for parole.  (Respondent's Exhibit E ("Ex. E").)  The Governor considered Petitioner's testimony regarding his criminal history, specifically calling attention to Petitioner's responses that he had been "at the wrong place at the wrong time" and had "never been aggressive."  (*Id.* at 1.)   The Governor took note of Petitioner's positive record in prison, but found that Petitioner had committed an "atrocious" murder which involved arming himself before looking for the victim and when he found her, she was "essentially trapped in the backseat" of a car when he shot her while she was in a defensive posture.  (*Id.* at 2.)   The Governor further found that Petitioner had failed to accept full responsibility for the crime, noting Petitioner's testimony that he did not intend to shoot the victim and that a friend had "insisted" that he arm himself.  (*Id.*)   The Governor's decision notes that he shared the concerns raised in the District Attorney's opposition, given that Petitioner was "a middle-aged, and, arguably, mature man when he murdered Ms. Bilhimer."  (*Id.* at 3.)   The Governor specifically found that Petitioner posed an unreasonable risk of danger to society based on this lack of insight into the crime.  (*Id.*)

Petitioner challenged the BPT's decision in Los Angeles County Superior Court, which issued a reasoned opinion denying Petitioner's claims.  The court found that there was "some evidence" to support the Governor's determination that Petitioner was unsuitable for parole because of the circumstances of the commitment offense and

because Petitioner does not fully accept responsibility for the crime and has an "assaultive criminal history." (Respondent's Exhibit F ("Ex. F" at 1.) The court found that the record supports the finding of the Governor that the circumstances of the crime support a finding of unsuitability because they were more than the minimum necessary to sustain a conviction for Second Degree Murder. (*Id.* at 2.) The court further found support for the Governor's finding that Petitioner is unsuitable for parole due to his failure to understand the nature and magnitude of the commitment offense. (*Id.* at 2-3) (citing *In Re McClendon*, 113 Cal.App.4th 315, 322 (2004).) The California Court of Appeal for the Second Appellate District and the California Supreme Court summarily denied Petitioner's habeas petition on September 29, 2005 and December 21, 2005, respectively. (Respondent's Exhibits G, H.) Thereafter, Petitioner filed the instant federal petition for a writ of habeas corpus on February 27, 2006.

## DISCUSSION

A.   Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 U.S.C. § 2254, provides "the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction." *White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004). Under AEDPA, this court may entertain a petition for habeas relief on behalf of a California state inmate "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted unless the state court's adjudication of any claim on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at § 2254(d). Under this deferential standard, federal habeas relief will not be granted "simply because [this] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id.* at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

B.   Legal Claims and Analysis

Petitioner claims that the Governor's denial of parole in 2005 violated his right to due process and the Ex Post Facto Clause of the United States Constitution.

1.   The BPT and Governor's Decision

California's parole scheme provides that the BPT "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b). In making this determination, the BPT considers various factors, including the prisoner's social history, the commitment offense and prior criminal history, and his behavior before, during and after the crime. *See* Cal. Code Regs. tit. 15, § 2402(b) – (d). Under California law, the Governor considers the same factors as the Board in determining whether to affirm or reverse the Board's decision. Cal. Const., art. V, § 8(b); *In re Rosenkrantz*, 29 Cal. 4th 616, 660 (2002)).

The record shows, and there is no dispute, that the BPT panel afforded Petitioner and his counsel an opportunity to speak and present their case at the hearing, gave them time to review Petitioner's central file, allowed them to present relevant documents and provided a reasoned decision denying parole. The panel concluded that Petitioner was suitable for parole and would not pose an unreasonable risk of danger to society and a threat to public safety if released from prison.  In the Governor's decision, he found that the circumstances of the commitment offense and Petitioner's lack of insight into his criminal history rendered him an unreasonable risk of danger to the public.  The

2.     The State Court Decisions

The state superior court found that the Governor's reversal of parole was supported by "some evidence" in the record.  (Exhibit F at 1.)  Specifically, the court found the Governor's findings that the nature and gravity of the offense and Petitioner's failure to accept full responsibility for the commitment offense were supported by some evidence in the record.  (*Id.*)  The superior court further found that the Governor's reversal did not solely rely on static factors.  (*Id.* at 3.)  The California Court of Appeal and Supreme Court summarily denied Petitioner's habeas petitions.

3.     The Federal Right to Due Process

California's parole scheme "gives rise to a cognizable liberty interest in release on parole" which cannot be denied without adequate procedural due process protections. *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002).  The determination does not depend on whether a parole release date has ever been set for the inmate because "[t]he liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 914-15 (9th Cir. 2003).

Due process requires that "some evidence" support the parole board's decision finding him unsuitable for parole. *Sass*, 461 F.3d at 1125 (holding that the "some

evidence" standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985), applies to parole decisions in § 2254 habeas petition); *Biggs*, 334 F.3d at 915 (same); *McQuillion*, 306 F.2d at 904 (same).  The "some evidence" standard is minimally stringent and ensures that "the record is not so devoid of evidence that the findings of [the BPT] were without support or otherwise arbitrary." *Hill*, 472 U.S. at 457. Determining whether this requirement is satisfied "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." *Id.* at 455-56 (quoted in *Sass*, 461 F.3d at 1128).  Due process also requires that the evidence underlying the parole board's decision have some indicia of reliability. *Biggs*, 334 F.3d at 915; *McQuillion*, 306 F.3d at 904.  In sum, if the parole board's determination of parole unsuitability is to satisfy due process, there must be some evidence, with some indicia of reliability, to support the decision.  *Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005).

When assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state.  *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007).  Accordingly, in California, the court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by "some evidence" constituted an unreasonable application of the "some evidence" principle articulated in *Hill*.  *Id.; see id.* at 852-53 (finding state court did not unreasonably apply "some evidence" standard to uphold parole suitability denial where there was some evidence at the time of the hearing to support a finding that the prisoner would present a danger to society based on the nature of the commitment offense under the applicable parole regulations).

The California Code of Regulations sets out the factors showing suitability or unsuitability for parole that the parole authority is required to consider.  *See* Cal. Code Regs. tit. 15, § 2402(b) (2001).  These include "[a]ll relevant, reliable information available," such as:

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

*Id.*

Circumstances tending to show unsuitability for parole include the nature of the commitment offense and whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." *Id.* § 2402(c).  This includes consideration of the number of victims, whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." *Id.*  Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail.  *Id.*

Circumstances tending to support a finding of suitability for parole include no juvenile record, a stable social history, signs of remorse, that the crime was committed as a result of significant stress in the prisoner's life, a lack of criminal history, a

11

reduced possibility of recidivism due to the prisoner's present age, that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release, and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. *Id.* § 2402(d).

The recent California Supreme Court case of *In re Lawrence*, 44 Cal.4th 1181 (Cal. 2008), clarified that under California law, in order to deny parole, the Board must find that the prisoner is a current threat to public safety, not that some of the specific factors in the regulations have or have not been established. *Id.* at 1212. This means that the "some evidence" test is whether there is "some evidence" that the prisoner is a threat, not whether there is "some evidence" to support particular secondary findings of the Board, for instance that the prisoner needs more time for rehabilitation. *See Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) (when assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state).

There was evidence before the Governor here to indicate that Petitioner continued to pose an unreasonable risk of danger to society. To begin with, there is evidence to support the finding that the murder was more than that minimally necessary to commit the crime of Second Degree Murder. Moreover, there is support in the record for the findings that Petitioner had a prior history of criminality, which is some of the relevant evidence that may be considered in determining suitability for parole. Although the Superior Court found that the Governor could not properly rely on Petitioner's arrest history for three assaults for which there were no convictions, the evidence before the Governor and the Board included convictions for criminal acts spanning more than two decades.

Further, there is support for the finding that Petitioner's testimony about the

12

murder and about his criminal record reflects that he presents an unreasonable risk to the public because he lacks insight into the crime and his criminal history. Petitioner testified at length about his attitude toward the life crime and the circumstances of his life before, during and after the crime, all appropriate things for the Board and the Governor to consider. Petitioner's statements about these events certainly reflect a lack of insight his own behavior. While Petitioner was seventy three years old at the time of the hearing, given his numerous contacts with the criminal justice system over a period of many years and the fact that he was middle-aged at the time of the crime, it cannot be said here that Petitioner has "a reduced possibility of recidivism due to the prisoner's present age," as set forth in the regulations.

The Court finds that the Governor's reliance on these factors, including the circumstances of the crime and Petitioner's criminal history and lack of insight into his behavior, constitutes "some evidence" to support the determination that Petitioner continued to present a risk of danger if released to the public, and consequently that Petitioner was not suitable for parole.

The Ninth Circuit has noted that "over time" the "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment" would "raise serious questions involving his liberty interest in parole." *Biggs*, 334 F.3d at 916. However, in this case the Governor's reversal of parole was not only based upon Petitioner's commitment offense. Here, there were other supported reasons, described above, for his denial of parole as well.

Based upon the record in this case, the state courts' determination that there was some reliable evidence to support the Governor's decision, and that Petitioner's right to due process was not violated, was not contrary to or an unreasonable application of federal law. *See, e.g., Rosas*, 428 F.3d at 1232-33 (upholding denial of parole based on gravity of offense and psychiatric reports); *Biggs*, 334 F.3d at 916 (upholding denial of

parole based solely on gravity of offense and conduct prior to imprisonment); *Morales*, 16 F.3d at 1005 (upholding denial of parole based on criminal history, cruel nature of offense, and need for further psychiatric treatment).  Accordingly, habeas relief is not warranted on this claim.

Petitioner also argues that his rights were violated by Governor's reversal which failed to consider that he has served in excess of the "matrix" of the appropriate parole terms for prisoners who have been convicted of his life crime.  "The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider."  Cal. Const. art. V, § 8(b). The constitutional provision also provides that no decision of the BPT on a life prisoner's parole eligibility becomes effective for a period of thirty days, during which the Governor may conduct his review.

The regulations contain a matrix of suggested base terms that provides three choices of suggested base terms for several categories of crimes.  See Cal. Code Regs. tit. 15, § 2403.  For second degree murders, the matrix of base terms ranges from a low of fifteen, sixteen or seventeen years, to a high of nineteen, twenty or twenty-one years, depending on certain facts of the crime.  Although the matrix is used to establish a base term, this occurs only once the prisoner has been found suitable for parole.  *See id.; In re Dannenberg*, 34 Cal. 4th 1069, 1071 (Cal. 2005).  The statutory scheme elevates a prisoner's suitability for parole above their expectancy in the early setting of a fixed date designed to ensure term uniformity.  *Id.* at 1070-71.

> While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raises "*public safety*" concerns requiring further indefinite incarceration.  (Italics added.)  Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger*.

14

*Id.* at 1070 (emphasis, brackets and parentheses in original).  Indeed, the very regulation that includes the matrix states that "[t]he panel shall set a base term for each life prisoner *who is found suitable for parole*."  Cal. Code Regs. tit. 15, § 2403(a) (emphasis added).  "[T]he Board, exercising its traditional broad discretion, may protect public safety *in each discrete case* by considering the dangerous implications of a life-maximum prisoner's crime individually."  *Dannenberg*, 34 Cal. 4th at 1071 (emphasis in original).  The same is true of the Governor's determination.  The California Supreme Court's determination of state law is binding in this federal habeas action.  *See Hicks v. Feiock*, 485 U.S. 624, 629 (1988); *Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979).  Petitioner did not have a due process right created by state law to be released under the term set by the matrix notwithstanding the Governor's reversal, and of course there is no such direct federal right.  This claim is without merit.

    4.  Ex Post Facto Claim

    Petitioner further claims that the use of the Governor's authority to reverse parole in this case violates his rights under the Ex Post Facto Clause.  Although he does not explain how this violation occurred, presumably, this is because the change in the law that occurred when the voters approved Proposition 89, which added section 8(b) to Article V of the California Constitution and gave the Governor the right to review the Board's decisions. The court notes that Article V, section 8(b) of the California Constitution, which grants the Governor power to review, modify and reverse decisions of the Board of Prison Terms, was adopted after petitioner committed his commitment offense.

    Application of the Ex Post Facto Clause, according to the Supreme Court, is limited to when criminal legislation that effects an increase in punishment, criminalizes conduct that was not previously criminal, or requires more proof for conviction of an offense than was previously required.  *See Collins v. Youngblood*, 497 U.S. 37, 42 (1990), *citing Calder v. Bull*, 3 Dall. 386, 390 (1798).  In *California Department of Corrections v. Morales*, 514 U.S. 499

15

(1995), the Court stated that without evidence that the new law substantively changed the definition of criminal conduct or altered the standards of parole eligibility, it created "only the most speculative and attenuated risk of increasing the measure of punishment." *Id.* at 514.

The Ninth Circuit, in *Johnson v. Gomez*, 92 F.3d 964 (9th Cir. 1996), rejected the contention that the California Governor's reversal of a grant of parole by the Board violated the Ex Post Facto Clause.  The appellate panel ruled that by merely adding a stage of review the law remained "neutral" rather than invidious:

> In this case, Johnson is similarly unable to demonstrate that an increase in his punishment actually occurred, because, like the petitioner in *Morales*, he had not been granted parole under the old law. *Morales*, 514 U.S. [at 503].  Under the old law, the BPT's decision would have been subjected to no review. Johnson's case is like *Dobbert* [*v. Florida*, 432 U.S. 282 (1977)] where the petitioner could only speculate whether the jury would have imposed a life sentence had it possessed the final power to decide. *Dobbert*, 432 U.S. at 294 & n. 7.  Here, because the BPT's parole decision is not final until after the expiration of the thirty-day gubernatorial review period, it cannot be said with certainty that the BPT would have granted Johnson parole had it possessed the final review authority.

> Johnson argues that, unlike the administrative convenience purpose of the law in *Morales*, the purpose and effect of the law here is to lengthen prison terms by making it more difficult for convicted murderers with indeterminate sentences to be released on parole.  However, the law itself is neutral inasmuch as it gives the Governor power to either affirm or reverse a BPT's granting or denial of parole.  Moreover, the Governor must use the same criteria as the BPT.  The law, therefore, simply removes final parole decisionmaking [sic] authority from the BPT and places it in the hands of the Governor.  We cannot materially distinguish this change in the law from that at issue in *Mallett v. North Carolina*, 181 U.S. [589, 590 (1901)]. In *Mallett*, the Court found no ex post facto violation where the new law allowed for higher court review of intermediate court decisions, even though the petitioner would have been entitled to a final intermediate court decision at the time of his crime. *Id.* at 597.  We therefore conclude that the application of Proposition 89 to authorize the Governor's review of Johnson's grant of parole did not violate the Ex Post Facto Clause.

*Id.* at 967.

In *Garner v. Jones*, 529 U.S. 244 (2000), decided after *Johnson*, the Supreme Court addressed an inmate's as-applied constitutional challenge to "the retroactive application of a Georgia law permitting the extension of intervals between parole considerations." *Id.* at 246. The Court declared that the "standard announced in *Morales* requires a more rigorous analysis of the level of risk created by the change in the law," rather than mere speculation: "We do

16

not accept the Court of Appeals' supposition that the [new law] 'seems certain' to result in some prisoners serving extended periods of incarceration."  *Id.* at 255.  The Supreme Court stated that the relevant inquiry is that "[w]hen the rule does not by its own terms show a significant risk, the respondent must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule."  *Id.*  The statute at issue in *Garner* vested the Parole Board with discretion to set an inmate's parole reconsideration hearing date and the power to permit expedited parole reviews if the circumstances warrant.  *See id.* at 254.  Petitioner's claim fails under *Johnson* and *Garner*.  Petitioner's contentions mirror those rejected in *Johnson*.  Because the Governor's review is based on the same criteria and record used by the Board, the layer of review itself is neutral.  Petitioner can only speculate that the Board, if it had the final decision-making power, would have granted parole under the old law.  Like the inmate in *Johnson*, because he had not been granted parole under the old law, petitioner cannot demonstrate that an increase in punishment occurred.

Petitioner's claim also fails under *Garner*'s as-applied test.  *Garner* directs this court to first examine whether the change is facially unconstitutional.  As discussed in the preceding paragraph, because it leaves untouched the standards by which parole eligibility is determined, the law at issue in the present petition does not violate the ex post facto clause.

Next, *Garner* directs this court to determine whether petitioner has shown that there is a significant risk that the rule's practical application will result in increasing the period of incarceration.  Petitioner has not overcome the presumption that the Governor followed the "statutory commands and internal policies in fulfilling [his] obligations."  *Garner*, 529 U.S. at 256.  The Governor's reversal reflects individualized consideration of petitioner's suitability for parole according to statutory commands and regulations in fulfilling his obligation to review decisions of the Board.  For the foregoing reasons, the authority to review Board

17

decisions granted to the Governor by Proposition 89 did not violate the Ex Post Facto Clause. Because there was no constitutional violation, the state courts' denial of this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court authority.

## CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus is DENIED. The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED: March 23, 2009

_____
JEFFREY S. WHITE
United States District Judge

18

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

ROGER W HAIRSTON,

            Plaintiff,

  v.

ARNOLD SCHWARZENEGGER et al,

            Defendant.
_____/

Case Number: CV06-01517 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 23, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Roger Hairston
P.O. Box 689
D34153
Soledad, CA 93960

Dated: March 23, 2009

*Jennifer Ottolini*

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk